## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-210 (TSC)** |
| **v.** | : | |
| | : | |
| **LETICIA VILHENA FERREIRA,** | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Leticia Vilhena Ferreira ("Ferreira") to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

### I.    Introduction

The defendant, Leticia Vilhena Ferreira, traveled from her home in Illinois, to Washington, D.C. to attend the rally that former President Donald Trump held on January 6, 2021. After arriving in the District of Columbia, Ferreira attended the Stop the Steal rally. After leaving the rally, Ferreira participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On June 22, 2022, Ferriera pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 30 days' incarceration and a 36-month term of probation, is appropriate in this case because Ferreira: (1) entered and remained in the Capitol Building for an extensive period of time—45 minutes; (2) chose to enter the Capitol Building after seeing tear gas deployed into an angry crowd of rioters gathered near the Inaugural stage; (3) had to duck to avoid tear gas while near the scaffolding set up for the Presidential Inauguration; (4)  entered the Capitol Building within two minutes of the door being breached, then she made her way, with other rioters, to the Crypt, (5) insinuated herself into a group of rioters who forced their way through a line of Capitol Police Officers who were attempting to stop the advance of the crowd through the Capitol Building; and (6) was not entirely truthful about her participation in the riot when interviewed by FBI agents.

The Court must also consider that Ferreira's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification warrants a jail sentence followed by a period of probation.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Ferreira's conduct and behavior on January 6.

### *Leticia Ferreira's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Leticia Ferreira, traveled from her home in Illinois to Washington, D.C. She attended the Stop the Steal rally on January 6.  After leaving the rally, Ferreira marched with other rioters to the United States Capitol.  She documented her approach through videos and photographs she took on her mobile telephone.   She passed the Peace Circle, which was surrounding by bike racks and not yet covered in a swarm of rioters, indicating she was among the first wave of rioters to reach Capitol grounds.



*See* Ex. A-3.[2]

Ferreira continued on her quest to reach the Capitol Building while ignoring numerous warnings that the public was prohibited from entering the Capitol grounds on January 6. For instance, on the West lawn, bike racks were set up around the lawn to keep the public out, and snow fencing was in place closer to the Inaugural stage. Ferreira saw that the snow fencing was trampled in many areas, and "AREA CLOSED" signs were posted. *See* Exs. A-1, A-2. Heedless

---

[2] The exhibits in this case are categorized by source. Exhibit A items are videos from Ferreira's phone. Exhibit B items are open source videos. Exhibit C items are United States Capitol CCTV videos. Exhibit D is Ferreira's post-arrest statement. The photos included in this sentencing memorandum are snapshots from the videos.

of those signs, she entered the West lawn and observed that the progress of a large mob was stopped near the inaugural stage and that United States Capitol Police Officers—clearly outnumbered—were standing on the terrace.



*See* Ex. A-4 (stillshot of video depicted above).



*See* Ex. B-1_A.

Ferreira did not change course and leave the Capitol grounds even when tear gas was set off around her.



Ex. A-5 (stillshot from video above).



*See* Exs. B-1_B; B-2 (Ferreira moves to scaffolding); B-1_C (Ferreira near scaffolding at 39 seconds); A-6.

Nor did she heed the warning that was blaring from the loudspeaker:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Ex. B-1_C.

Ferreira entered the Capitol Building through the Senate Wing Door at 2:14:38 pm, only 90 seconds after the windows immediately adjacent to the door were smashed out and the door forced open by other rioters. The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass:



*See* Ex. C-1, at 2:13pm.  Exactly 90 seconds after the entry depicted above, Ferreira entered

the U.S. Capitol through the Senate Door.  *Id*. at 2:14:38pm.



Ferreira filmed her entry, capturing an alarm blaring in the background, shattered glass

from the windows and a toppled kiosk in her line of sight.  *See* Ex. A-7 (stillshot from video

below).



Rioters made their way to the Crypt.  Here, their progress was temporarily halted by a line of United States Capitol Police Officers.  *See* Ex. C-2.  Ferreira entered the Crypt at 2:18pm.  *Id*. at 2:18:02pm.  She stood near the wall for a short time before she began inching closer to the mob gathered near the police line.  *See Id*. at 2:19:16 (near rear wall in between two statues), 2:19:45-2:21:52 (Ferreira walks into crowd, towards police line on left); B-1_D (Ferreira at :08 and :37). Ferreira stood in the thick of the mob while officers were accosted.  *See* Ex. B-1_E (stillshot from video below); *see also* Ex. B-3 (Ferreira captured 26 sec. in).



At approximately 2:25pm, the crowd pushed through the police line, and the rioters rushed further into the Capitol. *See* Ex. C-2, at 2:25:17. Ferreira took advantage of the break in the dam and moved through the Capitol on the heels of other rioters. *See* Ex. B-4 (Ferreira captured 3 min. 25 sec. in; 7 min. 48 sec. in).

The mob of rioters climbed stairs to the second floor. Ferreira followed, while the mob chanted, "Nancy! Nancy! Nancy!" in an ominous tone. *See* Ex. A-8. Ferreira moved through the Rotunda and took a short video. *See* Ex. A-9. She then walked into the East Rotunda Lobby. *See* Ex. C-3, at 2:37:17.

When she entered the Rotunda Lobby, there were two Capitol Police officers standing guard inside the East Rotunda Doors. *See* Ex. C-4, at 2:37:00-2:37:21. There were other rioters inside the Lobby, but it had not yet been overrun. Some of the rioters were talking to the officers. *Id.* Less than a minute after Ferreira entered the Lobby, the crowd of rioters in front of the officers began to swell. *Id.*, beginning at 2:37:37. Several of the rioters started beating on the doors and

the officers were pushed aside. *Id*. at 2:38:34. Ferreira watched—and even used her phone to take

video and/or photographs—as rioters overwhelmed the officers and forced the doors open to allow

other rioters inside the Capitol. *See* Ex. A-10; Ex. C-4, at 2:38:44 (Ferreira in view beginning at

2:39:10).



Ex. C-3, at 2:38:44.



*Id*. at C-3, at 2:39:22.

Ferreira later reversed her course, descended a staircase, and made her way to the area of the Senate Wing Door. She appeared to be alone and not walking with anyone in particular while she was inside the Capitol. She exited the Capitol building at 2:59pm. *See* Ex. A-11.

In total, Ferreira spent 45 minutes inside of the Capitol. Ferreira knew at the time she entered the U.S. Capitol Building that she did not have permission to do so, yet she went inside and paraded, demonstrated or picketed.

*Leticia Ferreira's Interview*

Ferreira voluntarily agreed to an interview with the FBI following her arrest on February 16, 2022. Ex. D, Ferreira's Post Miranda Statement. During the interview, Ferreira explained that she traveled to Washington, D.C., to see President Trump speak. She believed that January 6, 2021, would be an important day in history and she wanted to be part of it. *Id*. at 12:19-12:36. Ferreira said she walked from an area near the rally towards the Capitol building before

President Trump's speech ended.  She walked with a father and his sons, whose names she did not know, and she followed them onto Capitol grounds.  *Id.* at 16:30—19:05.  Ferreira said when they walked onto Capitol grounds she saw that the fencing was already torn down.  *Id*. at 19:06—19:10.  Ferreira described "walking past the trouble that [she] only saw on t.v. after" and witnessed "Capitol guards passing out water" to the rioters.  *Id.* at 19:25—20:00.  Ferreira then went inside the Capitol.

Ferreira entered through the Senate Wing Door less than two minutes after it was violently breached.  *See* Ex. C-1, at 2:14:38pm.  When she went inside, she saw the windows smashed and "everything broken."  *See* Ex. D, at 20:02—20:08.  She said that "Capitol Police were not event confronting" the rioters, "they were greeting people."  *Id.* at 20:12—20:20; 42:45—42:48.

Ferreira equated her time in the Capitol to being on a "tour, like in a museum."  *Id*. at 25:00—25:04.  She described walking through the Capitol and arriving in the Rotunda, where she took photos and videos.  *Id.* at 21:45—22:20.  Ferreira said at one point on the "tour" she "hung out a little bit and saw some guys talking to the Capitol Guards" but "nothing was happening" and the "Capitol Guards were doing their job and letting the people [waive] the flag and nothing was happening."  49:15—49:30.  She said they "toured and left and there were no fights or anything" while she was inside.  *Id*. at 25:57—26:05.  Ferreira exited the Capitol building at approximately 2:59pm.  Ferraira left the Capitol and walked down a ramp outside the Senate Wing Door, and she saw the "Capitol Guards lined up and observing the patriots."  *Id.* at 25:05—25:19.

Ferreira claimed that she never saw any violence and had no knowledge that the events of the day would turn violent.  She said she knew "some people were there to instigate, but [she]

14

was never close to anyone who was getting violent." *Id.* at 43:06—43:17.  Ferriera said the first

time she learned of violence at the Capitol was later in the day when she was watching t.v. and

saw what happened. *Id.* at 31:00—31:10 .  Ferreira said she was "very irresponsible to walk in

past broken glass, but [she] did not fight anyone, did not touch the building or do anything

against the building". *Id*. at 20:34—20:47; 25:52—25:54.

*The Charges and Plea Agreement*

On February 14, 2022, Leticia Ferreira was charged by complaint with violating 18 U.S.C.

§§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 1.  On February 16, 2022,

she was arrested at her home in Illinois.  ECF 5.  Ferreira made an initial appearance on February

22 and was released on personal recognizance.  ECF 6; *see* Minute Entry of Feb. 22, 2022.  She

pleaded guilty to a one-count Information on June 22, 2022 charging her with a violation of 40

U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea

agreement, Leticia Ferreira agreed to pay $500 in restitution to the Department of the Treasury.

**III.      Statutory Penalties**

Ferreira now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by

the plea agreement and the U.S. Probation Office, Ferreira faces up to six months of imprisonment,

up to five years of probation, and a fine of up to $5,000. Ferreira must also pay restitution under

the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d

1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing

Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies

the factors a court must consider in formulating the sentence. Some of those factors include: the

15

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a brief period of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with police officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Ferreira's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time

inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Ferreira personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Ferriera's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Ferreira from most other misdemeanor defendants. Ferreira's lack of violence and property destruction is the only reason she was charged with, and permitted to plead to, a misdemeanor rather than a felony.

Ferreira positioned herself to take advantage of other rioters' brash and criminal conduct. She was amongst the earliest rioters from the rally to encroach on Capitol grounds, make her way to the Northwest terrace, then walk through the Senate Wing Door approximately 90 seconds after other rioters stormed the Capitol and forced entry through the windows and door in that area. While no police officers blocked her path into the Capitol, there is no doubt that she saw signs of violent entry. Ferreira filmed the condition of the Senate Connecting Corridor as she entered, capturing clear signs of violent entry—smashed windows and overturned kiosk, and an alarm blaring because of the breached door.

Ferriera claims not to have witnessed violence. Her statement is at odds with the video evidence and the timing of her entry into the Capitol. Ferreira was on the heels of the rioters who forced their way into the Capitol, and once inside, pushed deeper and deeper into the building. Video evidence shows that on at least three occasions Ferreira was present when violence occurred,

both outside and inside the Capitol.  First, Ferriera was on the West front close to the Inaugural Stage when officers deployed tear gas into the mob and an announcement was made over the loudspeaker for the rioters to disperse and leave the area.  *See* Exs. A-5; B-1_B; B-1_C.  Second, Ferreira entered the Crypt with a mob of rioters.  Here, she stood idly by as other rioters taunted police officers and pushed their way through police lines then seized on the opportunity to advance. *See* Exs. B-1_E; B-3; B-4; C-2.  Third, Ferreira entered the East Rotunda Lobby and watched while rioters approached Capitol Police officers guarding an exit.  The rioters closed the gap between their bodies and the officers and began pounding on the doors, causing the officers to step aside. Ex. C-4.  The doors were then forced open and a flood of rioters entered from outside.  Ex. C-4. The fact that Ferreira did not engage in violence or property destruction should not overshadow her willingness to observe and benefit from other rioters' actions.

Ferreira has not expressed remorse for her participation in the riot on January 6.  Quite opposite, she minimized her behavior and blamed others for her actions, telling the FBI a version of the day's events that at best amounts to a series of half-truths.  For instance, she described her time inside the Capitol as a "tour", even going so far as to say that Capitol Police Officers were handing out water to rioters, allowing people to enter the breached Senate Wing Door, and allowing rioters to waive their flags inside the Capitol.  Ferreira acknowledged signs of forced entry, and said she was "very irresponsible to walk in past broken glass," but she continued to rationalize her poor choices by declaring that "[she] did not fight anyone, did not touch the building or do anything against the building".  Ex. D, at 20:34—20:47; 25:52—25:54.  This is not contrition; it is blame-shifting.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Ferriera's History and Characteristics of

As set forth in the PSR, Ferreira has no criminal history.  PSR ¶¶ 23–24.  She is a citizen of Brazil, and she entered the United States in 2014 on a student visa.  PSR ¶ 35.  Ferreira has complied with pretrial release conditions.  PSR ¶ 7.  She has been employed as a Sustainability Project Engineer with a company in Illinois since July 31, 2019.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usual–should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see also United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing); *United States v. Mariposa Castro*, 1:21-CR-00299-RBW Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others?  Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and

that there's no real consequence, then people will say why not do it again.") (statement of Judge Walton at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Leticia Ferreira's actions on January 6 demonstrate the need for specific deterrence. Ferreira marched from the "Stop the Steal" rally to the United States Capitol. She took photographs and video throughout the day. As she approached Capitol grounds, she ignored red flags—barricades, fencing, and "area closed" signs—that the area was closed to the public. *See* Ex. A-2. She witnessed the large number of rioters compared to police officers charged with protecting the United States Capitol, and saw tear gas deployed while she was standing on the West lawn near the Inaugural stage. *See* Exs. A-4, A-5. In spite of all these signs, Ferreira was not deterred and continued into the Capitol building, walking through a point of entry that exhibited clear signs that others forced their way inside.

The government acknowledges that Ferreira accepted responsibility early by entering into the plea agreement. On the other hand, Ferreira has not expressed remorse for her actions, was not forthcoming with the FBI during her interview, and has not acknowledged the dangers and violence she witnessed on January 6, 2021. Ferreira told FBI agents that she never saw any violence and had no knowledge that the events of the day would turn violent. Videos from

Ferreira's phone, open source videos showing Ferreira, and CCTV footage of Ferreira in the United States Capitol demonstrate those statements were not truthful.  She filmed an explosion of tear gas into the crowd.  *See* Ex. A-5.  She entered the Senate Wing Door and filmed windows that had been broken open and a kiosk that was laying on the floor.  *See* Ex. A-7.  She was in the Crypt with other rioters whose progression was temporarily halted by a line of United States Capitol Police Officers, until a mob of rioters broke through the line.  *See* Ex. C-2.  And she watched rioters all but attack Capitol Police officers in the East Rotunda Lobby so they could open doors and allow a mob of rioters to enter.  These are minor examples of the mayhem that was unleashed at the United States Capitol on January 6—mayhem unfolding near and around Ferreira, which she did not characterize as dangerous or violent.  Her actions establish a need to deter her from doing this again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily

---

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

become the default.[5] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Ferreira has pleaded guilty to a one-count Information, charging her with parading, demonstrating, or picketing in the Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and

---

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of her participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officials, and large number of victims. Thus, even though many of the defendants were not charged

24

as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence that it imposed on Mitchell Paul Vukich, 1:21-CR-00539 TSC. Vukich claimed to be one of the first individuals inside. He remained inside for 20-25 minutes. He was tear gassed before entering. He walked the halls of the Capitol and stole papers while he was inside. During an interview with the FBI, he said he threw the papers away. This Court sentenced Vukich to 30 days' incarceration. In addition, Vukich was ordered to pay $500 in restitution.

The facts of Ferreira's case are similar to Vukich's in that she entered the Capitol building early, remained inside for a long time—at least 20 minutes longer that Vukich, and witnessed violence. However, unlike Vukich, Ferreira did not take anything while she was inside.

Another sentence to consider is the one imposed on Elliot Bishai, 1:21-CR-00282 TSC. Bishai entered the Capitol through a broken window adjacent to the Senate Wing Door approximately 30 minutes after the initial breach. Bishai entered a Senate conference room, then made his way through the Crypt to the Rotunda. In the Rotunda, he and others took photos of one another. Bishai agreed to an interview with the FBI, during which he was mostly forthcoming. He acknowledged witnessing violence, and he expressed remorse for his actions. This Court sentenced Bishai to 14 days' incarceration. This Court also ordered 12 months' supervised release, 60 hours of community service and payment of $500 in restitution.

Ferreira's case is distinguishable from Bishai's in a number of ways. First, Ferreira entered the Capitol within 90 seconds of the initial breach. Bishai entered almost fifteen minutes later. Second, Ferreira remained inside the Capitol 20 minutes longer than Bishai. Third, Ferreira was

not forthcoming with FBI agents during her interview.  Unlike Bishai, she denied witnessing any violence and minimized her conduct.  Fourth, Ferreira, unlike Bishai, did not express remorse for her actions.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    The Court's Lawful Authority to Impose A Split Sentence

As nine judges of this District have now concluded, this Court has the authority under 18 U.S.C. § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL

2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB) ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[6]   This Court should follow suit and sentence Ferreira to 30 days' incarceration and 36 months' probation.

---

[6] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Leticia Ferreira to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Melanie L. Alsworth
MELANIE L. ALSWORTH
Ark. Bar No. 2002095
Trial Attorney (Detailee)
United States Attorney's Office
District of Columbia
601 D Street, NW
Washington, DC  20530
(202) 598-2285
melanie.alsworth2@usdoj.gov